FILED
MAY 19 2004
LEONARD GREEN, Clerk

NOT RECOMMENDED FOR PUBLICATION

No. 03-3109

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| ARTHUR THOMAS, | ) |
| | ) |
| Plaintiff-Appellant, | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR THE |
| v. | ) SOUTHERN DISTRICT OF OHIO |
| | ) |
| THE UNION INSTITUTE, PETER | ) OPINION |
| HOLLISTER, SUSAN WOOD, and MARK | ) |
| ROSENMAN, | ) |
| | ) |
| Defendant-Appellee. | ) |

NOT RECOMMENDED FOR FULL-TEXT
PUBLICATION
Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.
This notice is to be prominently displayed if this decision is reproduced.

Before: GUY, GILMAN, and COOK, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** Arthur Thomas, Ed.D., who is African-American, brought suit against The Union Institute (TUI), alleging that TUI failed to renew his contract as executive assistant to the president because of his race. The district court granted TUI's motion for summary judgment, concluding that Thomas had failed to show any direct evidence of discrimination and had also failed to raise a genuine issue of material fact as to whether the legitimate, nondiscriminatory reasons given by TUI for not renewing his contract were a pretext designed to disguise racial discrimination. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

I. BACKGROUND

A. Factual background

*No. 03-3109*
*Thomas v. The Union Institute*

TUI is an alternative educational institution located in Cincinnati, Ohio, where students—or "learners" as TUI refers to them—follow self-directed programs to complete college degrees. Thomas was hired to work from December 15, 1998 through June 30, 1999 on Africa and African-American Programs at TUI. He reported directly to TUI's President Robert Conley, Ph.D. as Conley's executive assistant. When Thomas was hired, TUI was developing the Joint Doctoral Program (JDP). The JDP was a partnership between TUI and the University of Buea in Cameroon, West Africa, the purpose of which was to offer Ph.D.s to African students. In February of 1999, the TUI Board of Trustees approved implementation of the JDP.

Conley unexpectedly died of a heart attack the very next month. Shortly after his death, the executive committee of the Board of Trustees established the Executive Staff Committee (ESC) to serve as the interim administrative decisionmaking body. The Board of Trustees, in agreement with an ESC recommendation, suspended the JDP as of March 20, 1999 and consequently decided not to renew the contracts of three people, including Thomas, who were closely associated with the program.

## B. Procedural background

Thomas sued TUI and TUI Vice Presidents Peter Hollister, Mark Rosenman, and Susan Wood in January of 2001 for discrimination on the basis of race and for retaliation under 42 U.S.C. §§ 2000e-2-2000e-17 (Title VII), 42 U.S.C. § 1981, and Ohio Rev. Code §§ 4112.01-4112.99. The defendants moved for summary judgment, which the district court granted. This appeal followed.

## II. ANALYSIS

-2-

*No. 03-3109*
*Thomas v. The Union Institute*

## A. Summary judgment and Title VII standards

We review a district court's grant of summary judgment de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.* 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

An employee who brings a Title VII employment discrimination action may establish a claim by either presenting direct evidence of discrimination or by introducing "circumstantial evidence that would allow an inference of discriminatory treatment." *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003). Thomas alleges that the record includes both direct and circumstantial evidence of discrimination. We therefore analyze both alternatives below.

## B. Direct and circumstantial evidence of discrimination

### 1. Direct evidence

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2002) (quotation marks omitted). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude

*No. 03-3109*
*Thomas v. The Union Institute*

that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Id.*

The alleged "direct evidence" that Thomas presents are comments purportedly made by Conley about TUI's Vice Presidents Hollister, Rosenmann, and Wood; specifically, that Hollister was a "racist," that Rosenmann could not be trusted "in terms of race," and that Wood was "very, very conservative in terms of race." As a threshold issue, there is a serious question as to whether the statements allegedly made by Conley would even be admissible at trial. Because Thomas is offering Conley's statements for their truth—in an attempt to prove that Hollister, Rosenmann, and Wood are indeed racists—these comments are presumably hearsay. Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

Thomas argues, however, that Conley's alleged statements are nonhearsay party admissions under Rule 801(d)(2)(D) of the Federal Rules of Evidence. ("A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]"). We have no need to decide this issue because, for the reasons discussed below, the statements do not constitute direct evidence of discrimination.

These general comments concerning the alleged racism of Hollister, Rosenmann, and Wood are not direct evidence because they do not compel the conclusion that unlawful discrimination motivated Thomas's firing. Similarly, the comments made by Hollister to John Dobbins, TUI's director of community and media relations, that Dobbins was working too much with "minority

-4-

*No. 03-3109*
*Thomas v. The Union Institute*

organizations," and the comments allegedly made by Conely that whites on his staff criticized him for supporting minority programs, are not direct evidence of discrimination against Thomas. We agree with the district court's assessment that to the extent that these comments evidence racial animus, they fall short of showing "that such animus factored into the alleged employment actions."

"[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d at 865. This court has explained that "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." *Nguyen v. Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Direct evidence existed in *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, (6th Cir. 2000), where the university president purportedly said that "[w]e already have two black vice presidents. I can't bring in a black provost." *Id.* at 577 n.7. These comments required no inference to conclude that racial considerations motivated, at least in part, the employment decision in *Johnson*.

Conversely, in the present case, no clear connection exists between the general statements of racism and TUI's decision not to renew Thomas's contract. *See Johnson v. Kroger, Co.*, 319 F.3d at 865 ("The concern that Johnson's presence would adversely [a]ffect the . . . store's business . . . does not compel the conclusion that [the manager] sought to have Johnson removed from the position of comanager. Deriving this purported desire from [the manager's] comment requires the inferential step of concluding that because [he] held this belief, he would want to have Johnson's employment terminated.").

*No. 03-3109*
*Thomas v. The Union Institute*

### 2. Circumstantial evidence

Although Thomas failed to establish his discrimination claim with direct evidence, he has the alternative of making out a prima facie case of unlawful discrimination with sufficient circumstantial evidence. *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003). The burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), therefore applies. *Carter*, 349 F.3d at 273. "Establishing a prima facie case creates a rebuttable presumption of discrimination, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the challenged employment action." *Id.* If TUI satisfies this burden, Thomas "must then prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id.* (quotation marks omitted).

### a. Prima facie case

To establish a prima facie case of discrimination based upon circumstantial evidence, Thomas must show that he (1) "is a member of a protected group," (2) "was subject to an adverse employment decision," (3) "was qualified for the position," and (4) "was replaced by a person outside of the protected class." *Id.* Because TUI does not dispute that Thomas satisfies the first three *McDonnell-Douglas* requirements, he may establish a prima facie case by showing "that he was either replaced by a person outside of the protected class or show that similarly situated, non-protected employees were treated more favorably." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002).

No. 03-3109
*Thomas v. The Union Institute*

Thomas argues that he was replaced by Tony Curtis, a white male, as executive assistant to Conley's eventual successor, President Sturnick. He also argues that he was treated less favorably than Hollister, Rosenmann, and Wood. Whether these allegations satisfy *McDonnell Douglas*'s final element, however, need not be determined because even if Thomas could establish a prima facie case of discrimination, he would not prevail on his Title VII claim for the reasons that follow. We will therefore assume, without deciding, that Thomas established a prima facie case of discrimination.

### b. *Legitimate, nondiscriminatory reasons*

Assuming that Thomas could satisfy all of the elements of a prima facie case of employment discrimination, TUI may rebut the presumption of discrimination by presenting legitimate, nondiscriminatory reasons for its actions. *Carter*, 349 F.3d at 273. In TUI's "Response to [Thomas's] Charge of Discrimination," it stated that the decision to discontinue the JDP

> was based on concerns regarding the financial cost of the collaboration and the absence of plausible funding streams through which the university might quickly recoup the very significant investments planned for development and for the first years of projected operation.

TUI contends that "the suspension of the JDP in and of itself is a legitimate reason for not renewing [Thomas's] contract as the administration of and fundraising for the JDP were his primary duties."

### c. *Pretext*

To prevail, Thomas must show that these reasons are "a pretext to hide unlawful discrimination." *Carter*, 349 F.3d at 273. Determining whether proffered legitimate, nondiscriminatory reasons are pretextual "requires a heightened examination of the specific proofs and rebuttals of discriminatory motivation the parties have introduced." *Id.* at 274 (quotation marks

*No. 03-3109*
*Thomas v. The Union Institute*

omitted). To show pretext, Thomas may show that TUI's reasons "(1) [have] no basis in fact, (2) did not actually motivate [TUI's] challenged conduct, or (3) [were] insufficient to warrant the challenged conduct." *Id.*

Thomas argues that TUI's reasons for not renewing his contract are not based in fact and are therefore pretextual. He first contends that the district court granted summary judgment to TUI based upon grounds that TUI did not advance. Thomas explains that after TUI set forth its reasons for terminating him in its EEOC documents, he propounded discovery requests aimed at disproving TUI's assertion that financial reasons compelled the dissolution of the JDP.

TUI provided financial information pertinent solely to the first year of the projected JDP program. Thomas's expert was therefore able to give his opinion only about that year, rather than the first *years* of the JDP. The parties then stipulated that TUI would not attempt to discredit the expert's opinion "on the grounds that he did not opine on the 'years'—instead of the 'year' following the 1998-1999 fiscal year."

Thomas argues that the district court disregarded the parties' stipulation in holding that

> Wood's deposition testimony, and Plaintiff's other fiscal arguments, which all deal with internal sources of funding for the first year of the JPD, are therefore irrelevant, because Defendants do not claim that they terminated the JDP because TUI did not have sufficient money to pay for its first year. Rather, they stated that the decision was based on concerns about cost and the absence of funding streams by which TUI could recoup its investment in the program quickly, an investment which would have included the first-year costs.

He concludes that the district court granted summary judgment on a basis that TUI did not advance; namely, that Thomas had failed to establish plausible funding streams for JDP past the program's first year.

*No. 03-3109*
*Thomas v. The Union Institute*

This argument is not persuasive because TUI explained in its EEOC documents that the JDP was discontinued due to, among other things, "the absence of plausible funding streams through which the university might quickly recoup the very significant investments planned for development and for the first years of projected operation." The holding of the district court is essentially the same as TUI's EEOC statement. We are therefore not persuaded by Thomas's argument that the district court based its holding upon grounds other than those advanced by TUI.

Thomas's more compelling argument is that TUI actually *did* have the *internal* funds to support the JDP if it had elected to do so. He concludes, therefore, that TUI's proffered reasons—cost of the program and external funding streams—are pretextual. Keith A. Hock, a CPA and litigation consultant with Arthur Andersen LLP, served as Thomas's financial expert. Hock determined that the cost of the JDP for 1999-2000 was $511,000, and Thomas alleges that TUI had incorporated that amount for the JDP into its 1999-2000 budget. Concerning the plausible income sources, Hock determined that TUI had a minimum cash balance of $3,000,000 and a 1998-99 budget surplus of $880,000. Hock also suggested that TUI had possible external funding sources for the JDP. He noted in his expert report that Thomas had entered into discussions with a Washington, D.C. consulting firm that supposedly "helps organizations obtain government funding and/or grants."

TUI points out in response that Thomas erroneously focuses on TUI's internal financial resources and "ignores the uncontroverted evidence that the Board's decision in large part was based on the absence of *external* funding streams." Although Hock stated that Thomas had contacted

*No. 03-3109*
*Thomas v. The Union Institute*

prospective outside funders, TUI notes that no money from external sources had been raised for the JDP prior to the time that the program was terminated.

Even assuming that TUI had the internal funds to support the JDP, Thomas has not raised a genuine issue of material fact as to whether TUI's proffered reasons for discontinuing the JDP was "a pretext to hide unlawful discrimination." *Carter*, 349 F.3d at 273. TUI argues persuasively that no reasonable person would believe that TUI "would suspend an academic initiative in which it had expended significant time and resources solely as a way to discriminate against a single employee based on his race, national origin or advocacy of minorities." Thomas does not offer a connection between TUI's decision not to continue the JDP and any purported racial animus motivating the nonrenewal of his contract. For these reasons, Thomas's pretext argument to that effect must fail.

Thomas's final argument concerning pretext is that TUI has changed its proffered reasons over time and that this inconsistency indicates pretext. He argues that TUI first said that it suspended the JDP because of cost and a lack of plausible funding streams, but then changed its position and put forth different reasons, including the location of Cameroon, that Conley was the driving force behind the JDP and he died before any money was raised, that enrollment was down at TUI, and that no funds were designated for the JDP.

We agree with the district court's assessment that TUI's reasons are entirely consistent because "they revolve around the fact that Dr. Conley's death left the JDP leaderless and without sufficient funding to go on." Accordingly, we agree with the district court's determination that Thomas failed to raise a genuine issue of material fact as to whether TUI's proffered legitimate, nondiscriminatory reasons for not renewing his contract were pretextual.

-10-

No. 03-3109
*Thomas v. The Union Institute*

### D. Retaliation claim

In a separate but related line of argument, Thomas contends that TUI retaliated against him for opposing "employment practices made illegal by Title VII." Specifically, Thomas stated at a TUI seminar held just a few days before his discharge that "racism, institutionalized racism and discrimination very definitely exists at The Union Institute." He also notes that he engaged in protected activity by advocating the rights of minorities.

"[T]o prevail on a claim for retaliatory discharge under Title VII, a plaintiff must first establish a prima facie case by demonstrating that 1) the plaintiff engaged in an activity protected by Title VII; 2) the exercise of the plaintiff's civil rights was known to the defendant; 3) the defendant thereafter undertook an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment action." *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 521 (6th Cir. 2002). As in a case of employment discrimination under Title VII, once an employee makes out a prima facie case, the burden shifts to the employer to provide legitimate, nondiscriminatory reasons for the adverse employment action. *Id.* The employee "who bears the burden of persuasion throughout the entire process" must then show that "the proffered reason was a mere pretext for discrimination." *Id.*

Because Thomas cannot show that TUI's reasons for not renewing his contract were pretextual (see the discussion in Part II.B.2.c. above), we need not determine whether he can establish a prima facie case of retaliatory discharge. As persuasively explained in *Essex v. United Parcel Service, Inc.*, 111 F.3d 1304, 1309 (7th Cir. 1997), this precludes him from succeeding on his retaliation claim:

*No. 03-3109*
*Thomas v. The Union Institute*

> We need not decide whether Essex adequately made out a prima facie case of either race discrimination or retaliatory discharge. . . . Even assuming he did, Essex must present evidence that UPS's proffered reason for discharge—insubordination—is pretextual in order to succeed on either claim. Because we find that Essex failed to present any evidence from which a finder of fact could reasonably infer pretext, we affirm the district court's grant of summary judgment on both claims.

We therefore find no error in the district court's denial of relief to Thomas on this claim.

### E. Individual liability of Vice Presidents Hollister, Rosenmann, and Wood

Thomas's final argument is that the district court erred in holding that Hollister, Rosenmann, and Wood cannot be held liable under Title VII. This court has held that "an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII." *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997). Thomas does not argue that Hollister, Rosenmann, and Wood qualify as an "employer;" accordingly, we agree with the district court's decision to deny relief to Thomas on this claim.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.